**PAPA'S–JUNE MUSIC, INC., Plaintiff,**

v.

**Ramsey McLEAN, Defendant.**

**No. 95 Civ. 5396 (MGC).**

United States District Court,
S.D. New York.

April 11, 1996.

Caplin & Drysdale, Chartered by Christian R. Pastore, Carl S. Kravitz, James Sottile IV, New York City, (Weiss, Dawid, Fross, Zelnick & Lehrman, P.C. of counsel by Roger L. Zissu, New York City), for Plaintiff.

Jonathan D. Davis, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

This diversity action involves a dispute over control of the copyright in twelve songs on a record album entitled "She." Papa's–June Music, Inc., a Delaware corporation of which the performer Harry Connick, Jr. is the chief executive officer and principal shareholder, alleges that it had an oral contract providing for a seventy/thirty percent division of royalties and copyright ownership with Ramsey McLean, author of the lyrics. The alleged oral agreement also gave Papa's–June the exclusive right to exploit the songs. The complaint asserts claims for breach of contract, unjust enrichment, restitution, tortious interference with contract relations, declaratory judgment and fraud. McLean has moved to dismiss the claims other than fraud on the ground that section 204 of the Copyright Act, 17 U.S.C. § 204 (1988), bars enforcement of an oral agree-

ment transferring rights of copyright ownership. McLean has also moved to dismiss the fraud claim on the ground that under New York law an allegation that a party to an agreement never intended to comply with the terms of the agreement does not state a claim for fraud. For the reasons that follow, the motion to dismiss is granted, and Papa's June is granted leave to amend the complaint with respect to the claims other than fraud.

### Allegations of the First Amended Complaint

This dispute concerns twelve songs on an album called "She" that was publicly released in 1994. The complaint alleges that ownership of the copyright and division of royalties for these songs are governed by an agreement between the parties originally made in 1990.

In late 1989, Connick began to prepare an album entitled "We Are in Love." (First Am.Compl. ¶ 9.) McLean sent him a folder of "poems." (*Id.*) Connick rewrote some of the words, composed the music, and recorded the songs between March and April 1990. (*Id.* ¶ 10.) Five of the "jointly written" songs were ultimately selected for the "We Are in Love" album, which was released on June 4, 1990. (*Id.* ¶¶ 10, 13.) In April 1990, the parties entered into a Co–Publishing Agreement[1], under the terms of which Papa's–June and McLean own seventy and thirty percent, respectively, of the copyrights in the five "jointly written songs" on the "We Are in Love" album. (*Id.* ¶ 11.) Royalties are divided according to the same percentages. (*Id.*) Papa's–June has the exclusive right to license and publicly perform the songs. (*Id.*) The "jointly written songs" on the "We Are in Love Album" are also subject to the controlled composition clause in Connick's contract with his record company, Sony. (*Id.*) That clause sets the royalty rate paid by Sony at seventy-five percent of the statutory rate applicable to compulsory licenses under the Copyright Act. (*Id.* ¶ 3.)

In early 1991, McLean sent Connick a folder of "poems" for the "Blue Light, Red Light" album. (*Id.* ¶ 14.) Connick rewrote some of the words, composed the music, and recorded the songs in June and July 1991. (*Id.*) Some of the "jointly written" songs were included on the "Blue Light, Red Light" album, which was released on September 3, 1991. (*Id.*) On January 12, 1992, McLean signed an amendment to the Co–Publishing Agreement, which stated that the "jointly written compositions" on the "Blue Light, Red Light" album would be governed by the terms of the original Co–Publishing Agreement. (*Id.* ¶ 15.)

When Connick began planning the "She" album, McLean sent him a folder of "poems." (*Id.* ¶ 16.) Connick rewrote some of the words, composed the music, and recorded the songs. (*Id.*) On May 24, 1994, the master disk was delivered to Sony for manufacture and distribution. (*Id.* ¶ 17.) The "She" album was publicly released on July 12, 1994. (*Id.* ¶ 19.) According to the complaint, Papa's–June believed that McLean had delivered the "poems" for the "She" album with the understanding that the songs based on these "poems" would be governed by the terms of the Co–Publishing Agreement. (*Id.* ¶ 21.) On June 8, 1994, McLean notified Papa's–June that he wanted a different arrangement for the "jointly written songs" on the "She" album. (*Id.* ¶ 18.) On July 15, 1994, Papa's–June sent McLean an amendment to the Co–Publishing Agreement that would have extended its terms to the songs on the "She" album. (*Id.* ¶ 20.) McLean refused to sign the amendment. (*Id.*)

In early 1995, Papa's–June sent McLean two checks for his share of the royalties from the songs on the "She" album. (*Id.* ¶ 22.) Unbeknownst to Papa's–June, McLean also received two royalty checks from Sony. (*Id.*) McLean cashed all four checks. (*Id.*) McLean refused to refund to Papa's–June the royalty amount in excess of his thirty percent share under the Co–Publishing Agreement, approximately $60,000. (*Id.*) McLean has represented to various performance rights organizations around the world that he owns fifty percent of the copyright in the songs on

1. Connick, d/b/a June Music entered into the Co-Publishing Agreement with McLean in 1990. Upon its incorporation in October 1990, Papa's-

June succeeded to Connick's and June Music's rights, including those under the Co-Publishing Agreement. (First Am.Compl. ¶ 2.)

the "She" album, is entitled to fifty percent of the royalties, and has an equal right to license the songs. (*Id.* ¶ 24.)

## Discussion

 On a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), the factual allegations of the complaint are accepted as true, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 163, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517, 522 (1993), and all reasonable inferences are drawn in favor of the plaintiff, *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). A motion to dismiss should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Id.*

## I. Claims Other Than Fraud

The complaint alleges that the songs on the "She" album were "jointly written" by Connick and McLean. (*Id.* ¶¶ 1, 18.) McLean argues that since he is a joint author of the songs on the "She" album, he is entitled to an undivided one-half interest in the joint works. Section 204 of the Copyright Act requires a signed writing to effect a transfer of copyright ownership. McLean argues that since there has been no such writing with regard to the songs on the "She" album, he retains all his rights as a joint author of those songs, including the right to license them. Papa's–June argues that even though the complaint alleges that the songs on the "She" album are "jointly written," they are derivative works based on McLean's "poems," and that no writing is required for what is effectively a non-exclusive license agreement between Papa's–June and McLean for the use of McLean's poems. Alternatively, Papa's–June argues that even if the songs on the "She" album are joint works, no writing is required because the writing requirement of the Copyright Act does not apply to transfers between joint authors. Papa's–June also contends that there are writings that satisfy the requirements of the Copyright Act.

 The Copyright Act defines a "joint work" as a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. 17 U.S.C. § 101 (1988 & Supp.1993). The parts of a work are "interdependent" when they have some meaning standing alone but achieve their primary significance because of their combined effect, as in the case of the words and music of a song. *See Childress v. Taylor,* 945 F.2d 500, 505 (2d Cir.1991); H.R.Rep. No. 1476, 94th Cong., 2d Sess. 120 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736 (citing words and music of a song as example of interdependent parts of a joint work); S.Rep. No. 473, 94th Cong., 1st Sess. 103–04 (1975) (same). The requisite intent to create a joint work exists when the putative joint authors intend to regard themselves as joint authors. *Childress,* 945 F.2d at 507–08. It is not enough that they intend to merge their contributions into one unitary work. *Id.* at 507.

 The complaint alleges that McLean sent Connick "poems" and that Connick rewrote some of the words to make them singable. (First Am.Compl. ¶ 16.) From this, Papa's–June argues that McLean did not intend that his "poems" would be used as lyrics when he created them, and could not have intended that he and Connick would be joint authors of the songs on the "She" album. However, the complaint also alleges that the songs on the "She" album were "jointly written" by Connick and McLean. (First Am.Compl. ¶¶ 1, 18.) Indeed, the complaint alleges that McLean and Connick had "jointly written" songs for Connick's previous albums as well. (*Id.* ¶¶ 10–12, 14–15.) Papa's–June's after-the-fact argument that McLean only contributed "poems" is inconsistent with the allegations of the complaint taken as a whole.

 A "transfer of copyright ownership" is defined by the Copyright Act as "an assignment, ..., or any other conveyance, ... of a copyright or of any of the exclusive rights comprised in a copyright." 17 U.S.C. § 101. The Copyright Act presumes that the authors of a joint work are each entitled to an equal undivided interest in the copyright. *See* 17 U.S.C. § 201(a) (1988); *Chil-*

*dress*, 945 F.2d at 508. Each joint author also has an independent right to use or license the joint work. *See Community for Creative Non–Violence v. Reid*, 846 F.2d 1485, 1498 (D.C.Cir.1988), *aff'd*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); *cf.* 17 U.S.C. § 106 (1988 & Supp.1993) (copyright owner has the exclusive right to authorize reproductions, performances, displays, derivative works and distribution of copies of the copyrighted work). An agreement that alters these presumptions effects a "transfer of copyright ownership" between the joint authors. Under the terms of the Co–Publishing Agreement, instead of each joint author owning an equal undivided interest in the copyrights in the songs on the "She" album, Papa's–June owns seventy percent of the copyrights and McLean owns thirty percent. Instead of each author having an independent right to license or publicly perform the joint works, the Co–Publishing Agreement gives these rights exclusively to Papa's–June. Therefore, the complaint alleges a "transfer of copyright ownership" between McLean and Papa's–June.

■■ Section 204(a) of the Copyright Act provides that a "transfer of copyright ownership, . . ., is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Papa's–June argues that section 204(a) does not apply to transfers between the authors of a joint work. The starting point for interpretation of a statute is always its language. *Community for Creative Non–Violence*, 490 U.S. at 739, 109 S.Ct. at 2172, 104 L.Ed.2d at 824. The only explicit exemption in section 204 is for transfers of copyright that occur by operation of law. Section 204 does not contain language exempting copyright transfers between joint authors. The Copyright Act treats the authors of a joint work as co-owners of the copyright. 17 U.S.C. § 201(a). Papa's–June has not presented any authority that transfers of copyright ownership between co-owners who are not joint authors are exempt from the requirements of section 204(a). And there is nothing in the language of the Copyright Act which suggests that

transfers between co-owners who are joint authors should be treated differently.

Papa's–June argues that section 204(a) was designed to protect authors from unscrupulous third parties, not from their joint authors. In support of this position, it cites *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir.1982). Papa's–June reads *Eden Toys* too narrowly. The issue there was whether Eden Toys had standing to sue based on an exclusive license that was initially embodied in an oral agreement but was later formalized in a written agreement. *Id.* at 36. In holding that the later writing could satisfy the requirements of the Copyright Act, the Second Circuit also noted that the purpose of section 204(a) was "to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses." *Id.; see also Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir.1990) (section 204 ensures that creator will not inadvertently give away his copyright and forces party who wants to use copyright to negotiate with the creator to determine precisely what rights are being transferred and at what price), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). Although *Eden Toys* addressed a transfer of copyright ownership between parties that were not joint authors, the reasoning is just as applicable to transfers between joint authors. An author can mistakenly or fraudulently claim an oral transfer of copyright ownership from his joint author. If joint authors are forced to put their agreement into writing, there is less opportunity for fraud or mistake. Moreover, if an agreement to alter the statutory presumptions of equal ownership and equal right to license and perform the joint work is put into writing, the joint authors will have less need to resort to the courts to resolve disputes about the terms of their mutual understanding. *See Effects Associates*, 908 F.2d at 557. I therefore hold that the writing requirement of section 204(a) is applicable to transfers between joint authors.

■■ Section 204(a) does not mandate a particular form of transfer document. As Judge Kozinski has noted, a writing memorializing the assignment of copyright interests "doesn't have to be the Magna Carta; a one-

line pro forma statement will do." *Id.* However, the terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear. *See Playboy Enterprises, Inc. v. Dumas,* 831 F.Supp. 295, 308 (S.D.N.Y.1993), *aff'd in part and rev'd in part on other grounds,* 53 F.3d 549 (2d Cir.1995). While it is not required that the writing explicitly mention "copyright" or "exclusive rights," *see Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 413 (7th Cir.1992), the better practice is that it should, 1 William F. Patry, Copyright Law and Practice at 390; *cf. Playboy Enterprises,* 53 F.3d at 564 (writing that did not · expressly mention copyright failed to meet requirements of section 204(a)). And, of course, the owner of the copyright interests being conveyed must sign the document. 17 U.S.C. § 204(a).

The complaint alleges that in early 1995 McLean cashed two royalty checks from Papa's–June for the jointly written songs on the "She" album. (First Am.Compl. ¶ 22.) Papa's–June has supplemented the allegations of the complaint with an affidavit which states that royalty statements attached to the checks indicated that McLean's share of the royalties for the songs on the "She" album was thirty percent. (Wilkins Aff. ¶ 13, Exh. 1 & 2.) Papa's–June argues that by endorsing the checks McLean agreed that the terms of the Co–Publishing Agreement would govern the jointly written songs on the "She" album.

Papa's–June cites *Dean v. Burrows,* 732 F.Supp. 816 (E.D.Tenn.1989) for the proposition that endorsed checks satisfy the writing required by section 204(a). In *Dean,* a critical issue was the date on which the creator of a mold design for a ceramic animal figurine had transferred his copyright interests. Both the creator and the purchaser testified that the transfer occurred in March 1984 and that the creator had prepared a written transfer agreement in March 1984. *Id.* at 823. However, the agreement was not dated and was not signed or notarized until well over a year later, on November 8, 1985, a delay the court attributed to the purchaser's lack of legal advice on the technicalities of copyright law. *Id.* at 818–19, 823. The court

held that a check dated March 10, 1984, with the notation that it was payment for "mold designs and molds," endorsed by the creator, negotiated, posted and cancelled in March 1984, complied with the requirements of section 204(a). *Id.* at 823.

The decision in *Dean* was influenced by two factors, neither of which are present here. First, there was substantial uncontroverted evidence of an agreement to transfer copyright ownership when the check was endorsed by the creator. Both parties to the transfer testified that such an agreement existed. They also testified that the transferor had prepared contemporaneously with the transfer and negotiation of the check an unsigned writing which memorialized the terms of the agreement. By contrast, when Papa's–June sent McLean the royalty checks in early 1995, it had known since June 8, 1994 that McLean wanted a different arrangement for the jointly written songs on the "She" album. (First Am.Compl. ¶ 18.) Furthermore, in July 1994 McLean rejected Papa's–June's proposed amendment to the Co–Publishing Agreement and reasserted his demand for a new arrangement. (*Id.* ¶ 20.) In sum, the complaint alleges that there was sharp disagreement between Papa's–June and McLean at the time McLean endorsed the royalty checks. The unsigned agreement in *Dean* was prepared by the transferor, not the transferee. In this case, the royalty statements, which McLean never signed, were prepared by the transferee, Papa's–June, and not by McLean, the transferor.

Second, there was writing on the check in *Dean* which indicated, however inarticulately, that copyright ownership was being transferred. In this case, neither the royalty checks nor the attached royalty statements mention a transfer of copyright ownership. There is a notation at the bottom of the second page of the royalty statements—"@ 30%"—underneath the totals for the songs from the "She" album. Papa's–June argues that this notation on the attached royalty statements put McLean on notice that by endorsing the royalty checks he was agreeing to all the terms of the Co–Publishing Agreement, an eleven-page document (not including schedules) that covers among other

things ownership, licensing and performance rights. In light of the disagreement between Papa's–June and McLean at the time McLean endorsed the checks, the notations on the royalty statements indicate nothing more than the fact that the royalty checks are for an amount equal to thirty percent of the total royalties for the jointly written songs on the "She" album. *Cf.* 1 Patry, *supra*, at 392 (transfer agreements should be construed in favor of copyright transferor because section 204(a) reflects the policy judgment that copyright owners should retain all rights unless specifically transferred).

Papa's–June's claims for breach of contract, quasi-contract, restitution, declaratory judgment and tortious interference with contract relations are all premised on the allegation that the terms of the Co–Publishing Agreement govern the jointly written songs on the "She" album. Because the complaint does not allege a signed writing as required by section 204(a), there was no transfer of copyright ownership between Papa's–June and McLean, and the jointly written songs on the "She" album are not governed by the terms of the Co–Publishing Agreement. Papa's–June and McLean each have an equal undivided interest in the copyright in these songs and an independent right to license and perform them. Therefore, McLean's motion to dismiss the non-fraud claims for failure to state a claim is granted.

■ Papa's–June also argues that the alleged agreement with McLean affects only the division of royalties, not McLean's copyright interests in the jointly written songs on the "She" album. This argument is not consistent with the allegations of the complaint. The complaint alleges that the songs on the "She" album are governed by all the terms of the Co–Publishing Agreement, including the provisions regarding ownership of the copyright and the right to perform and license the songs. (First Am.Compl. ¶¶ 3, 26, 43–44.) However, an agreement concerning royalties does not constitute a "transfer of copyright ownership" within the meaning of 17 U.S.C. § 101. To the extent that Papa's–June has a good-faith basis upon which to allege that there was an agreement concerning the collection and distribution of royalties for the songs on the "She" album, it may so amend the complaint within the next thirty days.

## II. *Fraud Claim*

The complaint alleges that when McLean submitted his lyrics to Connick, McLean never intended that the jointly written songs on the "She" album would be governed by the terms of the Co–Publishing Agreement. (First Am.Compl. ¶ 55.) McLean, however, knew that Connick and Papa's–June believed that the songs on the "She" album would be governed by the terms of the Co–Publishing Agreement. (*Id.* ¶ 58.) According to the complaint, by not disclosing his secret intention to seek a different arrangement for the songs on the "She" album, McLean fraudulently induced Connick to use his lyrics. (*Id.* ¶ 60.) The issue is whether McLean can be held separately accountable on a claim of fraud for failure to disclose his intention not to perform in accordance with the Co–Publishing Agreement.

In *Sabo v. Delman*, 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906, 907 (1957), the New York Court of Appeals held that a promise made with the undisclosed intention of not performing constitutes a misrepresentation of a material fact upon which an action for rescission may be predicated. *See also Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259, 263, 151 N.E.2d 833, 836 (1958) (one who fraudulently misrepresents himself as intending to perform an agreement is liable regardless of whether the agreement is enforceable). It is important to note that the allegedly fraudulent representations at issue in *Sabo* were not contained in the contracts between the parties. They were alleged to be express representations made to induce contracts for assignment of patents. 3 N.Y.2d at 158–59, 164 N.Y.S.2d at 715–16, 143 N.E.2d at 907–08.

Most courts that have subsequently considered the issue have held that a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise. *E.g., Caniglia v. Chicago Tribune–*

*New York News Syndicate, Inc.*, 204 A.D.2d 233, 234, 612 N.Y.S.2d 146, 147 (1st Dep't. 1994); *Guterman v. RGA Accessories, Inc.*, 196 A.D.2d 785, 786, 602 N.Y.S.2d 116, 117 (1st Dep't.1993); *Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435, 436, 529 N.Y.S.2d 777, 779 (1st Dep't.1988); *Comtomark, Inc. v. Satellite Communications Network, Inc.*, 116 A.D.2d 499, 500, 497 N.Y.S.2d 371, 372 (1st Dep't.1986); *Spellman v. Columbia Manicure Mfg. Co.*, 111 A.D.2d 320, 323, 489 N.Y.S.2d 304, 307 (2d Dep't.1985); *L. Fatato, Inc. v. Decrescente Distrib. Co.*, 86 A.D.2d 600, 601, 446 N.Y.S.2d 120, 121–22 (2d Dep't. 1982); *Chase v. United Hospital*, 60 A.D.2d 558, 559, 400 N.Y.S.2d 343, 344 (1st Dep't. 1977); *Wegman v. Dairylea Coop., Inc.* 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 734–35 (4th Dep't.1975); *Miller v. Volk & Huxley, Inc.*, 44 A.D.2d 810, 810, 355 N.Y.S.2d 605, 606–07 (1st Dep't.1974); *PI, Inc. v. Quality Prods., Inc.*, 907 F.Supp. 752, 761 (S.D.N.Y. 1995); *Sudul v. Computer Outsourcing Servs.*, 868 F.Supp. 59, 62 (S.D.N.Y.1994); *Best Western Int'l, Inc. v. CSI Int'l Corp.*, 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994); *cf. New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 287, 662 N.E.2d 763, 767 (1995) (general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support claim for fraud). *Contra Bibeau v. Ward*, 193 A.D.2d 875, 877, 596 N.Y.S.2d 948, 950 (3rd Dep't.1993); *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir.1992); *Bower v. Weisman*, 650 F.Supp. 1415, 1423 (S.D.N.Y.1986).

 To maintain a claim for fraud, a plaintiff must allege: (1) a legal duty separate and apart from the contractual duty to perform, *see Van Neil v. Berger*, —— A.D.2d ——, 632 N.Y.S.2d 48, 48 (App.Div. 4th Dep't.1995); *Strasser v. Prudential Sec., Inc.*, —— A.D.2d ——, 630 N.Y.S.2d 80, 82 (App.Div. 1st Dep't.1995); *Locascio v. Aquavella*, 185 A.D.2d 689, 690, 586 N.Y.S.2d 78, 79 (4th Dep't.1992); *Mastropieri v. Solmar Constr. Co.*, 159 A.D.2d 698, 700, 553 N.Y.S.2d 187, 189 (2d Dep't.1990); *Tesoro Petroleum Corp. v. Holborn Oil Co.*, 108 A.D.2d 607, 607, 484 N.Y.S.2d 834, 835 (1st Dep't.1985); *Sudul*, 868 F.Supp. at 63; *Best Western Int'l, Inc.*, 1994 WL 465905, at *4–5;

*G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 909 (S.D.N.Y. 1994); (2) a fraudulent representation collateral or extraneous to the contract, *see Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986); *Sforza v. Health Ins. Plan of Greater New York, Inc.*, 210 A.D.2d 214, 214–15, 619 N.Y.S.2d 734, 736 (App.Div. 2d Dep't.1994); *McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (App. Div. 2d Dep't.1991); *Wallace v. Crisman*, 173 A.D.2d 322, 322, 573 N.Y.S.2d 654, 654 (1st Dep't.1991); *Metropolitan Transp. Auth. v. Triumph Advertising Prods., Inc.*, 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dep't.1986); *PI, Inc.*, 907 F.Supp. at 761; *Sudul*, 868 F.Supp. at 63; or (3) special damages proximately caused by the fraudulent representation that are not recoverable under the contract measure of damages, *see Deerfield Communications*, 68 N.Y.2d at 956, 510 N.Y.S.2d at 89–90, 502 N.E.2d at 1004–05; *Wallace*, 173 A.D.2d at 322, 573 N.Y.S.2d at 654; *Tuck Indus. v. Reichhold Chems., Inc.*, 151 A.D.2d 565, 566, 542 N.Y.S.2d 701, 702 (2d Dep't.1989); *Metropolitan Transp. Auth.*, 116 A.D.2d at 527–28, 497 N.Y.S.2d at 675; *Tesoro*, 108 A.D.2d at 607, 484 N.Y.S.2d at 835; *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 296 (2d Cir.1986); *Sudul*, 868 F.Supp. at 63; *Best Western Int'l, Inc.*, 1994 WL 465905, at *5; *Landgarten v. Noise Cancellation Technologies*, 1993 WL 312999 at *3 (S.D.N.Y. Aug. 11, 1993).

The recent decision of the New York Court of Appeals in *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995), does not change the law in this area. *Graubard* was a suit by a law firm against a former partner who, it was alleged, breached his fiduciary duty and his retirement contract when he persuaded a major client to leave the firm with him. The firm also asserted a claim for fraud based on oral promises made by the former partner at the time the retirement agreement was presented to the partnership for its approval, promises which the former partner never intended to honor. Although the Court of Appeals concluded that

the law firm had stated a viable fraud claim, it also held that apart from the contract, the former partner owed his firm a fiduciary duty not to solicit clients of the firm prior to his resignation. *Id.* at 119, 629 N.Y.S.2d at 1013, 653 N.E.2d at 1182. Moreover, the oral representations that were the basis of the fraud claim were collateral to the provisions of the retirement agreement. *Id.* at 116, 629 N.Y.S.2d at 1011, 653 N.E.2d at 1181. Thus, *Graubard* is consistent with the lower court decisions cited above.

The complaint does not allege a fraud claim that is sufficiently distinct from the breach of contract claim. It merely appends allegations about McLean's state of mind to the claim for breach of contract. There is no allegation that McLean owed Connick or Papa's–June a duty separate and apart from the alleged obligations under the Co–Publishing Agreement. Papa's–June does not allege that McLean's fraudulent representations were collateral to the Co–Publishing Agreement. Nor does Papa's–June seek special damages attributable to the fraud that are not recoverable under the contract claim. Because the only fraud alleged arises out of the same facts that serve as the basis for the breach of contract claim, Papa's–June's fraud claim fails to state a claim for fraud on which relief can be granted. *Locascio,* 185 A.D.2d at 690, 586 N.Y.S.2d at 79. The fact that Papa's–June's non-fraud claims are barred by the writing requirements of the Copyright Act does not change this conclusion. *See Guterman,* 196 A.D.2d at 785–86, 602 N.Y.S.2d at 117 (dismissing fraud claim where breach of contract claim is barred by Statute of Frauds); *McKernin,* 176 A.D.2d at 234, 574 N.Y.S.2d at 59–60 (same); *Chase,* 60 A.D.2d at 559, 400 N.Y.S.2d at 344 (same). Therefore, McLean's motion to dismiss the fraud claim pursuant to Fed.R.Civ.P. 12(b)(6) is granted.

### Conclusion

For the foregoing reasons, McLean's motion to dismiss the complaint in its entirety is granted. Papa's–June is granted leave to file an amended complaint within thirty days alleging claims other than fraud to the extent that it has a good-faith basis upon which to

allege that there was an enforceable agreement concerning the collection and distribution of royalties for the jointly written songs on the "She" album.

SO ORDERED.