**BELL SPORTS, INC.,
Plaintiff/Counter–
Defendant,**

v.

**SYSTEM SOFTWARE ASSOCIATES,
INC., and SSA MidAtlantic, Inc.,
Defendants/Counter–Plaintiffs.**

**No. CV 97–7121(ADS).**

United States District Court,
E.D. New York.

April 23, 1999.

**222**

Proskauer Rose LLP by Steven E. Obus, David Krulwich, New York City, for the plaintiff/counter-defendant.

Brown Raysman Millstein Felder & Steiner, LLP by Peter Brown, Ira Wurcel, New York City, for the defendant—counter-plaintiff SSA MidAtlantic.

Baker & McKenzie by Charles Cummings, Michael Garvey, New York City, for the defendant—counter-plaintiff System Software Associates.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The only universal consequence of a legally binding promise is, that the law makes the promisor pay damages if the promised event does not come to pass.—Oliver Wendell Holmes, *The Common Law* 236 ( [1881] Howe ed.1963).

In what can only be described as a classic breach of contract case, the Court is confronted with a complaint that alleges several causes of action sounding in tort, and a resulting motion by the defendants for judgment on the pleadings.

The plaintiff, Bell Sports, Inc. ("Bell" or the "plaintiff") initiated this action against System Software Associates, Inc. ("SSA") and SSA MidAtlantic ("SSA MidAtlantic") (collectively, the "defendants") on December 5, 1997 by filing a complaint alleging seven causes of action. These causes of action arise from Bell's acquisition of certain computer software from SSA and certain support services to run the computer software from SSA MidAtlantic. The first cause of action sets forth a claim of fraudulent inducement against both defendants. Bell asserts that the defendants made material misrepresentations that they knew to be false to induce them to enter into a contractual relationship. The second cause of action mirrors the first cause of action and asserts a claim of common law fraud against both defendants. The third and fourth causes of action seek declaratory judgments against SSA and SSA MidAtlantic, respectively, holding all agreements between Bell, SSA and SSA MidAtlantic null and void *ab initio*. The fifth cause of action contends that SSA intentionally breached certain warranties in connection with a Software Licensing Agreement. The sixth cause of action claims that SSA intentionally breached the Software Licensing Agreement. Finally, the seventh cause of action asserts that the conduct of both defendants in connection with the Software Licensing Agreement constituted gross negligent misrepresentation.

Presently before the Court are motions by the defendants for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R.Civ.P."). SSA moves for judgment on the pleadings on the first, second, third, fifth, sixth, and seventh causes of action, while SSA MidAtlantic moves for judgment on the pleadings on the first, second, fourth, and seventh causes of action.

## I. BACKGROUND

The following factual allegations are taken from the plaintiff's complaint. Bell is in the business of designing, manufacturing and marketing bicycle helmets, bicycle accessories and auto racing helmets. In July, 1995 Bell completed a merger with American Recreation Company Holdings, Inc. ("ARC"). The merged company retained the Bell name and assumed all rights and obligations of ARC, including all agreements with the defendants.

SSA is in the business of developing and licensing complex computer software. During all times relevant to Bell's com-

plaint, SSA owned an equity interest in SSA MidAtlantic. SSA MidAtlantic is in the business of providing consulting and advisory services regarding the authorization and installation of the software licensed by SSA.

In 1993, ARC decided to conduct a major overhaul of its business software as its then existing software was insufficient to address all of its needs. One of ARC's major concerns was that its new software be fully integrated so that data entered into one individual computer at one location would trigger automatic updates throughout the plants and facilities. Another critical requirement of the new software was that it have the capability of tracking important information. ARC hoped that the new software would enhance many of its systems, including order-processing, customer communications, financial analysis, inventory and manufacturing control, distribution management and strategic planning capabilities.

In 1993, ARC formed a team of personnel to detail specific requirements for a new software package. As a result, ARC distributed a Request for Proposal ("RFP") to software developers, including SSA, which sought detailed information and asked specific questions regarding the features of the respective software and the capabilities of the software in relation to ARC's business and needs.

Each RFP included a section that asked the software vendor whether its product had certain specific standard functions. For each specific standard function, a "Yes," answer meant that the current release of the existing software had that specific function. SSA MidAtlantic responded on behalf of SSA to ARC's RFP and provided a detailed description of its Business Planning and Control System Software ("BPCS"). SSA MidAtlantic's response contained a large number of "Yes" responses, representing to ARC that BPCS met approximately 80 percent of its specific performance criteria listed in its RFP.

In light of this favorable response, ARC commenced a series of meetings with SSA MidAtlantic to further explore BPCS's capabilities. At these meetings, ARC repeatedly stressed its business needs and what was expected of its BPCS. SSA, through SSA MidAtlantic, consistently represented to ARC that BPCS would satisfy those needs. Based upon these representations, ARC decided to select SSA as its software vendor and to license BPCS. Thereafter, SSA, SSA MidAtlantic and ARC entered into contract negotiations that culminated in the execution of several written agreements.

On April 29, 1994, SSA and ARC executed a Software Licensing Agreement that granted ARC a license to use SSA's BPCS, version 4.x, in exchange for a substantial fee. SSA assured ARC that its software package comported with SSA's representations regarding the then-current standard functions of BPCS. SSA specifically warranted that the software "shall function substantially in accordance with the related user documentation provided by SSA."

While negotiating the Software Licensing Agreement, it became apparent to ARC that version 4.x of BPCS was deficient in several material respects and that several critical modifications were necessary in order for BPCS to be able to perform in a manner that complied with ARC's original requirements, as well as SSA's representations.

By letter dated May 2, 1994, SSA MidAtlantic agreed to make such modifications, and agreed that the software and modifications would "meet the required applications stipulated by [ARC]." In addition, the parties executed a side letter, dated April 29, 1994, that supplemented and modified the Software Licensing Agreement. The side letter provided that the limitations of liability and disclaimers of warranty set forth in the Software Licensing Agreement would not apply "in the case of gross negligence, willful mis-

conduct, or intentional breach of contract on the part of SSA."

Contemporaneously with the execution of the aforementioned agreements, SSA MidAtlantic and ARC executed a Professional Services Agreement ("PSA"), dated April 29, 1994, ("the Service Agreement"), which set forth the training, installation services and support for BPCS that ARC would receive from SSA MidAtlantic. Bell asserts that SSA and SSA MidAtlantic knew at the time that they signed all of these agreements that BPCS could not perform in the manner represented by them and that they willfully and intentionally misled ARC, fraudulently inducing it to sign the agreements.

After execution of the aforementioned agreements, ARC began to implement BPCS. SSA MidAtlantic personnel conducted the training at ARC and at SSA MidAtlantic's facilities to prepare for the conversion of ARC's system to BPCS. During the process, ARC began to discover significant shortfalls in the performance capabilities of BPCS, and many significant deviations from representations made in SSA's response to ARC's RFP and throughout ARC's software vendor selection process. Once discovered, ARC repeatedly raised the issue of the lack of functionality of BPCS with SSA MidAtlantic. ARC also wrote SSA MidAtlantic in January, 1995, expressing dissatisfaction with the defects discovered in BPCS and the fact that ARC believed SSA and SSA MidAtlantic had made misrepresentations regarding BPCS's capabilities.

In February, 1995, Bell and ARC announced their plans to merge. The merger was completed in July, 1995. In May and June 1995, Bell decided to revamp its business-software and retained the services of Ernst & Young ("E & Y") to assist in the selection of a suitable software company. After a detailed study, E & Y contacted several software developers, seeking detailed answers to questions regarding the capabilities of software with respect to certain business requirements of the soon-to-be merged company, based on the items covered by ARC's RFP.

SSA MidAtlantic responded verbally to E & Y's questions, again providing numerous "Yes" answers to questions regarding BPCS's capabilities and asserting that the upgraded version 5.x of BPCS would provide for more than 80 percent of Bell's needs. E & Y proceeded to put into writing SSA's responses and sent the document to SSA MidAtlantic for approval. SSA MidAtlantic confirmed the accuracy of the document reflecting its answers on behalf of SSA to E & Y about BPCS.

The newly merged company had business needs that were similar to those of ARC as set forth in ARC's RFP of two years earlier. Thus, a key requirement set forth by Bell was that the software it purchased be fully integrated. SSA MidAtlantic made numerous representations that included the fact that BPCS was fully integrated. Based upon these representations, Bell decided to purchase and implement version 5.x of BPCS. Although aware of the problems ARC was having with BPCS, Bell decided to purchase a newer version of BPCS based upon specific assurances and representations from SSA and SSA MidAtlantic that ARC's problems with 4.x of BPCS were cured, and would not recur at Bell.

Between October, 1995 and January, 1996, SSA MidAtlantic training instructors and other SSA MidAtlantic representatives advised Bell that rather than install the then-current BPCS version 5.x that they had contracted for and were about to install, they should wait for an about-to-be released version 6.0 of BPCS which Bell was entitled to under an Amendment to the Software Licensing Agreement dated October 23, 1995. In the early Spring of 1996, Bell personnel attended several meetings at which SSA and an SSA MidAtlantic representative discussed version 6.0 of BPCS pending its release, and made numerous representations pertaining to version 6.0's capabilities.

Based upon these representations, the advice of SSA MidAtlantic representatives and the representations by SSA, Bell decided to delay the installation of the then-current version of BPCS 5.x in anticipation of the release of version 6.0. When BPCS version 6.0 was publicly released in May, 1996, SSA MidAtlantic and Bell started attempting to implement it at Bell. However, according to the complaint, it quickly became apparent to Bell that the functionality of BPCS version 6.0 was deficient in numerous areas critical to Bell, including four key elements of Bell's requirements— order entry functions, warehouse management, accounting functions, and tracking of imports—all of which had been clearly set forth in Bell's questions, to which SSA and SSA MidAtlantic had responded to positively.

By Mid 1996 Bell contends that it became aware that neither of the BPCS versions could perform in a fully functional manner as represented by SSA and SSA MidAtlantic. Bell alleges that the defendants representations as to critical capabilities of BPCS were simply false, that its software never could perform in the manner represented to Bell, and that the defendants knew this all along and intentionally misled Bell.

On October 1, 1996, Bell sent SSA a letter notifying it that it was canceling both the Software License Agreement and the 1995 Amendment, and was seeking reimbursement of the amounts it had paid to SSA in connection with the agreements. SSA did not respond to the letter. As a result, Bell decided to remove all SSA software from its computers and file a complaint alleging the seven causes of action.

In more detail, the first cause of action asserts a fraudulent inducement claim against both defendants. Specifically, the first cause of action contends that the defendants made material misrepresentations that they knew were false and that were made in order to induce ARC and Bell to license BPCS from SSA and enter into the Software Licensing Agreement, the ARC side letter, the Service Agreement, and the 1995 Amendment. The second cause of action is virtually identical to the first cause of action and asserts a claim of common law. fraud against both defendants.

The third and fourth causes of action seek a declaratory judgment that all agreements between ARC/Bell, SSA, and SSA MidAtlantic are void *ab initio*. Specifically, these causes of action are premised on ARC/Bell's contention that they were induced by fraud to enter into the Software License Agreement, the ARC Side Letter, the Service Agreement, and the 1995 Amendment, and are thus entitled to an Order of this Court finding these contracts null and void *ab initio*.

The fifth cause of action claims that SSA intentionally breached the Software Licensing Agreement warranty that stated that the software delivered would work substantially in accordance with the user documentation relevant to the software. Bell asserts that SSA knew that BPCS could not work substantially in accordance with its express and implied warranties and that such warranties were false. The sixth cause of action claims that SSA intentionally breached its contract with Bell as it knew that BPCS could not work in the manner represented, neither on the existing processor nor on a stronger processor. In addition, Bell claims that SSA breached the Software License Agreement by failing to provide the software products that were the subject of the 1996 Amendment, which SSA signed knowing that it would be unable to do so. Furthermore, Bell argues that SSA intentionally breached the Software Licensing Agreement by failing to take actions that it was required to take under the 1995 Amendment, which SSA signed knowing that it would not be able to comply with its terms. Finally, the seventh cause of action, which is similar to the first and second causes of actions, claims that both defendants committed gross negligent misrepresentations in con-

junction with the contracts entered into by ARC and Bell. Specifically, the seventh cause of action argues that the defendants knew or should have known that their representations were false, and that they were made with careless disregard for the consequences of such conduct, thereby making such conduct grossly negligent.

## II. DISCUSSION

### A. *Rule 12(c) Standard*

In a motion for judgment on the pleadings pursuant to Rule 12(c) of the Fed. R.Civ.P., the Court applies the same standard as it would in a motion to dismiss pursuant to Rule 12(b)(6) of the Fed. R.Civ.P. *See Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) (citing *Ad–Hoc Comm. Of Baruch Black and Hispanic Alumni Ass'n. v. Bernard M. Baruch College,* 835 F.2d 980, 982 [2d Cir.1987]). As such, the Court will examine the standards under Rule 12(b)(6).

On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 44 (2d Cir.1997) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 [1957] ); *see also IUE AFL—CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). The Second Circuit stated that in deciding a Rule 12(b)(6) motion, a district court "must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 662 (2d Cir.1996) (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991)); *International Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 72 (2d Cir.1995); *Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993); *Rent Stabilization Ass'n of the City of New York v. Dinkins,* 5 F.3d 591, 593–94 (2d Cir.1993) (citing *Samuels,* 992 F.2d at 15); *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991).

It is not the Court's function to weigh the evidence that might be presented at a trial; the Court must merely determine whether the complaint itself is legally sufficient, *see Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985), and in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true, *see Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 14 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990), and construe all reasonable inferences in favor of the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996); *LaBounty,* 933 F.2d at 123; *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1098 (2d Cir. 1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

The Court is mindful that under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and that "[a]ll pleadings shall be so construed as to do substantial justice," Fed.R.Civ.P. 8(f).

The issue before the Court on a Rule 12(b)(6) motion "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (quoting *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683). Recovery may appear remote and unlikely on the face of the pleading, but that is not

the test for dismissal under Rule 12(b)(6). *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995) (quoting *Weisman v. LeLandais*, 532 F.2d 308, 311 (2d Cir.1976) [per curiam]).

It is within this framework that the Court addresses the motions for judgment on the pleadings.

### B. *The Plaintiff's First, Second, Third, and Fourth Causes of Action*

Bell asserts that a factual misrepresentation in connection with the negotiation of a contract can create liability for fraud in the inducement. In addition, Bell contends that a misrepresentation of present facts (as opposed to future events) may constitute fraud. Finally, Bell claims that a promise made with a preconceived and undisclosed intention of not performing constitutes a fraudulent misrepresentation.

In *Clark–Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656–57 (1987), the New York Court of Appeals held that:

It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.[ ] Merely charging a breach of a "duty of care," employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim.

■ While there does seem to be some precedent for Bell's proposition that a promise made with the undisclosed intention of not performing may constitute a fraudulent misrepresentation, *See e.g., Sabo v. Delman,* 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906 (1957), "[m]ost courts that have subsequently considered the issue have held that a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise." *See Papa's– June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1160–61 (S.D.N.Y.1996) (citing *Caniglia v. Chicago Tribune–New York News Syndicate, Inc.,* 204 A.D.2d 233, 234, 612 N.Y.S.2d 146, 147 [1st Dep't.1994]; *Guterman v. RGA Accessories, Inc.,* 196 A.D.2d 785, 786, 602 N.Y.S.2d 116, 117 [1st Dep't. 1993]; *Gordon v. Dino De Laurentiis Corp.,* 141 A.D.2d 435, 436, 529 N.Y.S.2d 777, 779 [1st Dep't.1988]; *Comtomark, Inc. v. Satellite Communications Network, Inc.,* 116 A.D.2d 499, 500, 497 N.Y.S.2d 371, 372 [1st Dep't.1986]; *Spellman v. Columbia Manicure Mfg. Co.,* 111 A.D.2d 320, 323, 489 N.Y.S.2d 304, 307 [2d Dep't. 1985]; *L. Fatato, Inc. v. Decrescente Distributing Co.,* 86 A.D.2d 600, 601, 446 N.Y.S.2d 120, 121–22 [2d Dep't.1982]; *Chase v. United Hospital,* 60 A.D.2d 558, 559, 400 N.Y.S.2d 343, 344 [1st Dep't.1977]; *Wegman v. Dairylea Coop., Inc.,* 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 734–35 [4th Dep't.1975]; *Miller v. Volk & Huxley, Inc.,* 44 A.D.2d 810, 810, 355 N.Y.S.2d 605, 606–07 [1st Dep't.1974]; *PI, Inc. v. Quality Prods., Inc.,* 907 F.Supp. 752, 761 [S.D.N.Y.1995]; *Sudul v. Computer Outsourcing Services,* 868 F.Supp. 59, 62 [S.D.N.Y.1994]).

■ To maintain causes of action for fraud, therefore, a plaintiff must allege: "(1) a legal duty separate and apart from the contractual duty to perform; (2) a fraudulent representation collateral or extraneous to the contract; or (3) special damages proximately caused by the fraudulent representation that are not recoverable under the contract measure of damages." *Papa's–June Music,* 921 F.Supp. at 1161; *see also Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d Cir.1996).

■ In the Court's view, Bell has not alleged the violation of a legal duty independent of those contained in the Software Licensing Agreement, the ARC side letter, the Service Agreement, and the 1995

Amendment. Bell's first four causes of action which assert, respectively, claims of fraudulent inducement, common law fraud, and two counts seeking a declaratory judgment, are all based upon alleged intentional misrepresentations by SSA and SSA MidAtlantic with regard to the capability of BPCS and the ability to service and implement the BPCS software. Neither SSA nor SSA MidAtlantic made a promise separate and apart from their duty specifically imposed by the Software Licensing Agreement, the ARC side letter, the Service Agreement, and the 1995 Amendment. The misrepresentations that Bell contends were fraudulently made by SSA and SSA MidAtlantic were not collateral to the terms of the various licensing agreements and contracts. In fact, the representations were the very essence of those various agreements. In short, Bell's complaint does not allege a claim of fraud that is sufficiently distinct, collateral or extraneous from its breach of contract claim.

In addition, Bell has not set forth special damages caused by the alleged fraudulent representations that would not otherwise be recoverable under the breach of contract measure of damages. *Papa's–June Music*, 921 F.Supp. at 1161. Bell's complaint requests the following damages:

Bell has suffered substantial damages, including but not limited to: causing Bell to pay substantial sums to SSA and SSA MidAtlantic while receiving nothing of value in return; causing Bell to expend substantial time and effort in a software selection process that was invalidated by BPCS' inability to perform as represented; expending substantial time and effort in undergoing Defendants' useless training; and causing Bell to forego the benefits it would have realized had it been able to install software products that functioned in accordance with Defendants representations. The full amount in extent of these damages is not presently capable of being precise-

ly ascertained, but is believed to be in excess of $4.6 million.

(Bell's Complaint at ¶¶ 68, 74 and 109).

■ In addition to the fact that Bell has requested the identical amount of money damages in its fraud claims as in its contract claims, thus implying, circumstantially, that the damages sought are identical, Bell's request for damages on its tort claims are recoverable under a breach of contract or breach of warranty theory. *See Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366, 373, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992) (holding that contract damages are ordinarily intended to give the injured party the benefit of the bargain by awarding a sum of money that will, to the extent possible, put that party in as good a position as it would have been in had the contract been performed) (citing Restatement Second of Contract § 347, comment a; § 344).

Therefore, due to the fact that Bell's complaint fails to allege (1) a legal duty separate and apart from the contractual duty to perform; (2) a fraudulent representation collateral or extraneous to the contract; or (3) special damages proximately caused by the fraudulent representation that are not recoverable under the contract measure of damages, the Court grants the defendants motions for judgment on the pleadings insofar as they seek to dismiss Bell's first, second, third, and fourth tort causes of action.

### C. The Plaintiff's Seventh Cause of Action

■ As stated above, Bell's seventh cause of action essentially duplicates the causes of action asserting fraud. However, this cause of action states in the alternative that the alleged misrepresentations were made not intentionally, but with gross negligence. The claim of gross negligent misrepresentation is undoubtedly not collateral or extraneous to the terms of the various licensing agreements and contracts. As this claim arises directly from the various licensing agreements and con-

tracts entered into by ARC, Bell, SSA and SSA MidAtlantic it is clear that this cause of action must also be dismissed. However, even if the Court were to analyze the merits of the gross negligent misrepresentation claim, it is clear that no special relationship exists between ARC, Bell, SSA and SSA MidAtlantic that would warrant a viable cause of action.

▉ In order for Bell to recover for grossly negligent misrepresentation, a special relationship or duty of care arising from its relationship with SSA or SSA MidAtlantic must be breached. *See e.g., Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 156 (2d Cir.1995); *Heard v. City of New York*, 82 N.Y.2d 66, 74, 603 N.Y.S.2d 414, 418, 623 N.E.2d 541 (1993). Did SSA or SSA Mid Atlantic owe ARC and Bell a "special" duty to exercise reasonable care in providing them the information about BPCS and its integration?

▉ It is clear to this Court that no special relationship existed between ARC/Bell and either SSA and SSA MidAtlantic. Under New York law, no special relationship exists between a software purchaser and the reseller or servicer of the software. *See e.g., Columbus McKinnon Corp. v. China Semiconductor Co., Ltd.*, 867 F.Supp. 1173 (W.D.N.Y.1994); *Casalino Interior Demolition Corp. v. Custom Design Data*, 235 A.D.2d 514, 653 N.Y.S.2d 35 (2d Dep't 1997); *RKB Enterprises, Inc. v. Ernst & Young*, 182 A.D.2d 971, 582 N.Y.S.2d 814 (3rd Dep't 1992). SSA and SSA MidAtlantic were not in a special relationship with ARC or Bell when they negotiated the various contracts and service agreements. ARC and Bell are both large companies with ample resources, skill, and competent counsel. In addition, Bell was represented by Ernst & Young, an international accounting and consulting firm, when it entered into its contract for BPCS. Under established authority, it cannot be said that the technical nature of computers and computer software imposes a special relationship and/or duty upon the software vendor who enters into a contract with a large, highly skilled company such as ARC or Bell.

Therefore, even if the Court were to examine the merits of the gross negligent misrepresentation claim, the defendants motion for judgment on the pleadings would be granted, as no special relationship or duty exists between ARC, Bell, SSA and SSA MidAtlantic.

### D. *The Plaintiff's Fifth and Sixth Causes of Action*

▉ SSA submits that it is entitled to judgment on the pleadings on Bell's fifth and sixth causes of action as the *tort* of intentional breach of contract or warranty is inapplicable to the facts of the case and because Bell did not allege that SSA's sole purpose in breaching the Licensing Agreement or the warranties contained therein was to injure Bell. Bell asserts that it has not alleged that SSA committed the *tort* of intentional breach of contract or warranty. Instead, Bell argues that its fifth and sixth causes of action are premised on its belief that (1) SSA breached the Licensing Agreement with them, thereby giving rise to a claim for breach of contract and/or warranty; and (2) SSA's breach was carried out intentionally and, therefore, the limitations of liability set forth in paragraph 12 of the April 29, 1994 Letter Agreement with respect to unintentional breaches are inapplicable.

The Court agrees with Bell and finds that the fifth and sixth causes of action are sufficiently plead, pursuant to Rule 8 of the Fed.R.Civ.P., grounded on the non-tort claims of breach of contract and breach of warranty. The fact that Bell has alleged that such conduct was intentional and couched the pleadings in language that conjures tortious conduct, does not necessarily mandate a judgment on the pleadings in favor of SSA. Bell's fifth and sixth causes of action were drafted in an effort to avoid the limitations of liability provision discussed above, not necessarily to

invoke a tort claim of intentional breach of contract and/or warranty. Thus, while these causes of action do not plead the tort of intentional breach of contract and/or warranty, they sufficiently set forth causes of action for breach of contract and breach of warranty.

### III. CONCLUSION

Having reviewed the parties' submissions and afforded them the opportunity to present oral argument, it is hereby

**ORDERED,** that System Software Associates motion for judgment on the pleadings on the first, second, third, and seventh causes of action is **GRANTED,** and those causes of action are hereby dismissed; and it is further

**ORDERED,** that SSA MidAtlantic's motion for judgment on the pleadings as to the first, second, fourth, and seventh causes of action is **GRANTED,** and those causes of action are hereby dismissed; and it is further

**ORDERED,** that System Software Associates motion for judgment on the pleadings as to the fifth and sixth causes of action are **DENIED.**

**ORDERED,** that the Clerk of the Court amend the caption to read as follows:

BELL SPORTS, INC., Plaintiff/Counter–Defendant,

against

SYSTEM SOFTWARE ASSOCIATES, INC., Defendant/Counter–Plaintiff.

**SO ORDERED.**