**BELL SPORTS, INC.,**
**Plaintiff/Counter–**
**Defendant,**

v.

**SYSTEM SOFTWARE ASSOCIATES,**
**INC., Defendant/Counter–**
**Plaintiff.**

**No. CV–97–7121–ADS.**

United States District Court,
E.D. New York.

Oct. 18, 1999.

Proskauer Rose LLP, New York, NY (Steven E. Obus, David Krulwich, Of Counsel), for Plaintiff/Counter–Defendant.

Brown Raysman Millstein Felder & Steiner, LLP, New York, NY (Peter Brown, Ira Wurcel, Of Counsel), for Defendant—Counter–Plaintiff SSA MidAtlantic.

Baker & McKenzie, New York, NY, (Charles Cummings, Michael Garvey, Of Counsel), for Defendant—Counter–Plaintiff System Software Associates.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff, Bell Sports, Inc. ("Bell" or the "plaintiff") initiated this action against System Software Associates, Inc. ("SSA") and SSA MidAtlantic ("SSA MidAtlantic") (collectively, the "defendants") on December 5, 1997 by filing a complaint alleging seven causes of action. These causes of action arise from Bell's acquisition of certain computer software from SSA and certain support services to run the computer software from SSA MidAtlantic.

The first cause of action sets forth a claim of fraudulent inducement against both defendants. Bell asserts that the defendants made material misrepresentations that they knew to be false to induce it to enter into a contractual relationship. The second cause of action mirrors the first and asserts a claim of common law fraud against both defendants. The third and fourth causes of action seek declaratory judgments against SSA and SSA MidAtlantic, respectively, seeking a declaration that all agreements between Bell, SSA and SSA MidAtlantic are null and void *ab initio*. The fifth cause of action contends that SSA intentionally breached certain warranties in connection with a Software Licensing Agreement. The sixth cause of action claims that SSA intentionally breached the Software Licensing Agreement. Finally, the seventh cause of action asserts that the conduct of both defendants in connection with the Software Licensing Agreement constituted gross negligent misrepresentation.

On April 23, 1999, the Court rendered a decision on the motions by the defendants for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."). The court dismissed the first, second, third, fourth and seventh causes of action. The basis for the Court's dismissal of the fraud counts was that:

[t]he misrepresentations that Bell contends were fraudulently made by SSA and SSA MidAtlantic were not collateral to the terms of the various licensing agreements and contracts. In fact, the representations were the very essence of those various agreements. In short, Bell's complaint does not allege a claim

of fraud that is sufficiently distinct, collateral or extraneous from its breach of contract claim. *Bell Sports Inc. v. System Software Associates, Inc.*, 45 F.Supp.2d 220, 228 (E.D.N.Y.1999).

Pursuant to Fed.R.Civ.P. 60(b) and Local Civil Rule 6.3, Bell now moves for reconsideration of the Court's April 23, 1999 decision. In addition, Bell moves to amend its complaint pursuant to Fed. R.Civ.P. 15(a).

## I. BACKGROUND

Familiarity with the facts · and the Court's prior decision is presumed, and will not be reiterated here. Briefly stated, the factual background of this case as set forth in the plaintiff's complaint is as follows. Bell is in the business of designing, manufacturing and marketing bicycle helmets, bicycle accessories and auto racing helmets. SSA is in the business of developing and licensing complex computer software. SSA MidAtlantic is in the business of providing consulting and advisory services regarding the authorization and installation of the SSA licensed software. SSA owned an equity interest in SSA MidAtlantic.

In 1993, American Recreation Company Holdings, Inc. ("ARC"), the name of the company before it merged with Bell in 1995, decided to conduct a major overhaul of its business software as its then existing software was insufficient to address all of its needs. ARC's major concerns were that its new software be fully integrated so that data entered into one individual computer at one location would trigger automatic updates throughout the plants and facilities and that the new software have the capability of tracking important information.

In 1993, ARC formed a team of personnel to detail specific requirements for a new software package. As a result, ARC distributed a Request for Proposal ("RFP") to software developers, including SSA, which sought detailed information and asked specific questions regarding the features of the respective software and the capabilities of the software in relation to ARC's business and needs. Each RFP included a section that asked the software vendor whether its product had certain specific standard functions. For each specific standard function, a "Yes," answer meant that the current release of the existing software had that specific function. SSA MidAtlantic responded on behalf of SSA to ·ARC's RFP and provided a detailed description of its Business Planning and Control System Software ("BPCS"). SSA MidAtlantic's response contained a large number of "Yes" responses, representing to ARC that BPCS met approximately 80 percent of the specific performance criteria listed in its RFP.

In light of this favorable response, ARC commenced a series of meetings with SSA MidAtlantic to further explore BPCS's capabilities. At these meetings, ARC repeatedly stressed its business needs and what was expected of its BPCS. SSA, through SSA MidAtlantic, consistently represented to ARC that BPCS would satisfy those needs. Based upon these representations, ARC decided to select SSA as its software vendor and to license BPCS. Thereafter, SSA, SSA MidAtlantic and ARC entered into contract negotiations that culminated in the execution of several written agreements.

On April 29, 1994, SSA and ARC executed a Software Licensing Agreement that granted ARC a license to use SSA's BPCS, version 4.x, in exchange for a substantial fee. SSA assured ARC that its software package comported with SSA's representations regarding the then-current standard functions of BPCS. SSA specifically warranted that the software "shall function substantially in accordance with the related user documentation provided by SSA." In addition, the parties executed a side letter, dated April 29, 1994, that supplemented and modified the Software Licensing Agreement. The side letter provided

that the limitations of liability and disclaimers of warranty set forth in the Software Licensing Agreement would not apply "in the case of gross negligence, willful misconduct, or intentional breach of contract on the part of SSA."

Contemporaneously with the execution of the aforementioned agreements, SSA MidAtlantic and ARC executed a Professional Services Agreement ("PSA"), dated April 29, 1994, ("the Service Agreement"), which set forth the training, installation services and support for BPCS that ARC would receive from SSA MidAtlantic. Bell asserts that SSA and SSA MidAtlantic knew at the time that they signed all of these agreements that BPCS could not perform in the manner represented by them and that they willfully and intentionally misled ARC, fraudulently inducing it to enter into the Licensing Agreement, the Service Agreement and the side letter dated April 29, 1994.

While negotiating the Software Licensing Agreement, it became apparent to ARC that version 4.x of BPCS was deficient in several material respects and that several critical modifications were necessary in order for BPCS to be able to perform in a manner that complied with ARC's original requirements, as well as SSA's representations. By letter dated May 2, 1994, SSA MidAtlantic agreed to make such modifications, and agreed that the software and modifications would "meet the required applications stipulated by [ARC]."

After execution of the aforementioned agreements, ARC began to implement BPCS. SSA MidAtlantic personnel conducted the training at ARC and at SSA MidAtlantic's facilities to prepare for the conversion of ARC's system to BPCS. During the process, ARC alleges that they began to discover significant shortfalls in the performance capabilities of BPCS, and many major deviations from representations made in SSA's response to ARC's RFP and throughout ARC's software vendor selection process. Once discovered,

ARC repeatedly raised with SSA MidAtlantic the issue of the lack of functionality of BPCS. In January, 1995 ARC also wrote to SSA MidAtlantic expressing dissatisfaction with the defects discovered in BPCS and the fact that ARC believed SSA and SSA MidAtlantic had made misrepresentations regarding BPCS's capabilities.

In February, 1995, Bell and ARC announced their plans to merge. The merger was completed in July, 1995. In May and June 1995, Bell decided to revamp its business-software and retained the services of Ernst & Young ("E & Y") to assist in the selection of a suitable software company. After a detailed study, E & Y contacted several software developers, seeking detailed answers to questions regarding the capabilities of software with respect to certain business requirements of the soon-to-be merged company, based on the items covered by ARC's RFP.

SSA MidAtlantic responded verbally to E & Y's questions, again providing numerous "Yes" answers to questions regarding BPCS's capabilities and asserting that the upgraded version 5.x of BPCS would provide for more than 80 percent of Bell's needs. E & Y proceeded to put into writing SSA's responses and sent the document to SSA MidAtlantic for approval. SSA MidAtlantic confirmed the accuracy of the document reflecting its answers on behalf of SSA to E & Y about BPCS.

The newly merged company had business needs that were similar to those of ARC as set forth in ARC's RFP of two years earlier. Thus, a key requirement set forth by Bell was that the software it purchased be fully integrated. SSA MidAtlantic made numerous representations that included the fact that BPCS was fully integrated. Based upon these representations, Bell decided to purchase and implement version 5.x of BPCS. Although aware of the problems ARC was having with BPCS, Bell decided to purchase a newer version of BPCS based upon specific assurances and representations from SSA

and SSA MidAtlantic that ARC's problems with 4.x of BPCS were remedied, and would not recur at Bell.

Between October, 1995 and January, 1996, SSA MidAtlantic training instructors and other SSA MidAtlantic representatives advised Bell that rather than install the then-current BPCS version 5.x that they had contracted for and were about to install, they should wait for an about-to-be released version 6.0 of BPCS, which Bell was entitled to under an Amendment to the Software Licensing Agreement dated October 23, 1995. In the early Spring of 1996, Bell personnel attended several meetings at which SSA and an SSA MidAtlantic representatives discussed version 6.0 of BPCS pending its release, and made numerous representations pertaining to version 6.0's capabilities.

Based upon these representations, the advice of SSA MidAtlantic representatives and the representations by SSA, Bell decided to delay the installation of the then-current version of BPCS 5.x in anticipation of the release of version 6.0. When BPCS version 6.0 was publicly released in May, 1996, SSA MidAtlantic and Bell attempted to implement it at the Bell facilities. However, according to the complaint, it quickly became apparent to Bell that the functionality of BPCS version 6.0 was deficient in numerous areas critical to Bell, including four key elements of its requirements—order entry functions, warehouse management, accounting functions, and tracking of imports—all of which had been clearly set forth in Bell's questions, to which SSA and SSA MidAtlantic had positively responded.

By Mid 1996 Bell contends that it became aware that neither of the BPCS versions could perform in a fully functional manner as represented by SSA and SSA MidAtlantic. Bell alleges that the defendants' representations as to critical capabilities of BPCS were simply false; that its software never could perform in the manner represented to Bell; and that the defendants knew this all along and intentionally misled Bell.

On October 1, 1996, Bell sent SSA a letter notifying it that it was canceling both the Software License Agreement and the 1995 Amendment, and that it was seeking reimbursement of the amounts it had paid to SSA in connection with the agreements. SSA did not respond to the letter. As a result, Bell decided to remove all SSA software from its computers and commence this action.

## II. DISCUSSION

### A. THE PLAINTIFF'S MOTION FOR RECONSIDERATION OR REARGUMENT

Motions for reargument are governed by Rule 6.3 (formerly Rule 3[j]) of the Local Rules of the United States Courts for the Southern and Eastern Districts of New York. Local Rule 6.3 provides as follows:

A notice of motion for reargument shall be served within ten (10) days after the docketing of the court's determination of the original motion. There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. No oral argument shall be heard unless the court grants the motion and specifically directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court.

■ The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 256–57 (2d Cir.1995) (citations omitted). The difficult burden imposed on the moving party has been established "in order to dissuade repetitive arguments on issues that have already been considered fully by the

Court." *Ruiz v. Commissioner of the D.O.T. of City of New York,* 687 F.Supp. 888, 890 (S.D.N.Y.1988), *modified on other grounds,* 934 F.2d 450 (2d Cir.1991). To grant such a motion means that a Court must find that it overlooked "matters or controlling decisions" which, if it had considered such issues, "would have mandated a different result." *Durant v. Traditional Investments, Ltd.,* 88 CV 9048, 1990 WL 269854 (S.D.N.Y. April 25, 1990).

Bell argues that:

it would appear that the Court overlooked Bell Sports' right, in these circumstances, to plead its fraudulent inducement claims against SSA *in the alternative to its contract claims.* In the absence of SSA's acknowledgment that the alleged misrepresentation, if proven, were in fact a part of the contracts between the parties, SSA, as well, might be permitted to escape all liability for its wrongdoing. Bell Sports alleges in its Complaint that SSA misrepresented the capabilities of its software (directly or through its agent, SSA MidAtlantic) in the responses to Bell Sports' requests for proposals. It appears that SSA will argue, at trial, that it did not breach its contracts with Bell sports not only because its software allegedly comported with the RFP responses, but also because, they will contend, the contracts do not in any event mandate compliance with the specifications set forth in the RFP responses. The contracts, they may argue, merely require the delivery of the software, but do not include the additional specifications that SSA represented existed during the RFP process.

(emphasis in original).

The Court's prior decision, dismissing Bell's causes of action based on claims of fraud and fraudulent inducement, were dismissed based on the Court's belief that theses causes of action failed to allege "(1) a legal duty separate and apart from the contractual duty to perform; (2) a fraudu-

lent representation collateral or extraneous to the contract; or (3) special damages proximately caused by the fraudulent representation that are not recoverable under the contract measure of damages." *Papa's–June Music v. McLean,* 921 F.Supp. at 1154, 1161 (S.D.N.Y.1996); *see also Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d Cir.1996).

■ Essentially, Bell now claims that SSA will argue at trial that the misrepresentations contained in the RFP are not contained in the contract and thus the contract causes of action must also be dismissed. As a result, Bell claims that "[i]f the Court were to hold that the RFP responses are separate from the contracts and do not require, as part of the contracts, that the software perform in accordance with those representations, then Bell Sports would be left without a remedy against SSA." Upon reconsideration, the Court agrees.

In fact, Bell's assertion is supported by a recent letter from SSA, dated September 29, 1999, seeking leave of the Court to file a motion for summary judgment on the remaining contract causes of action. SSA argues that the "Licensing Agreement expressly states that SSA's software will function in accordance with its user documentation, *not the RFP*." This statement suggests that the RFP was collateral to the Licensing Agreement and cannot, therefore, form the basis of the plaintiff's breach of contract and breach of warranty claims. In addition, in SSA's memorandum of law in opposition to the motion for reconsideration, SSA states that "it bears emphasis that a response to an RFP is simply a preliminary evaluative step in a commercial relationship, unless explicitly provided otherwise. The License Agreement itself, which is expressly stated to be a full and binding statement of the relationship between the parties, is the definitive instrument." This statement by SSA suggests that the RFP was collateral to the Licensing Agreement. While the

Court's prior decision stated that "the representations [in the RFP] were the very essence of [the License Agreement]," *Bell Sports,* 45 F.Supp.2d at 228, the Court did not consider whether the plaintiff should be permitted to plead fraudulent inducement in the alternative to its breach of contract and breach of warranty claims. As a result, the Court overlooked the repercussions of its decision in light of the recent arguments put-forward by SSA.

On the one hand, SSA argues that even if they did intentionally make misrepresentations to Bell in the RFP in order to induce them to enter into the License Agreement, such conduct would merely constitute a breach of contract because the misrepresentations were the very essence of the contract. On the other hand, SSA contends that those same misrepresentations cannot provide the basis for a breach of contract claim, because they are not part of the License Agreement.

SSA's circular argument has led the Court to revisit the issue of whether the claims based on fraud and fraudulent inducement are collateral or extraneous to the contract. While the Court's original decision held that the RFP was the very essence of the contracts, upon reconsideration, the Court is not persuaded that, as a matter of law, such representations by SSA MidAtlantic, on behalf of SSA, were sufficiently distinct, collateral or extraneous from the breach of contract claims. This revision is based upon a closer examination of the Licensing Agreement which states that SSA's software will function in accordance with its user documentation, not the RFP. As it now appears possible that the Licensing Agreement did not incorporate the affirmative representations contained in the RFP, there is a distinct probability that the claims of fraud and fraudulent inducement, are separate and distinct from the terms of the Licensing Agreement.

Accordingly, the Court vacates its prior decision dismissing the first, second, third and fourth causes of action against SSA and SSA MidAtlantic, and will permit Bell to pursue its fraudulent inducement claims as well as its common law fraud claims against both defendants.

## B. *The Motion to Amend the Pleadings*

Fed.R.Civ.P. 15 states, in pertinent part, that "a party may amend ... [its] pleading only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a); *see also Jones v. New York State Division of Military and Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999). However, "leave [to amend a pleading] shall be freely given when justice so requires." Fed. R.Civ.P. 15(a); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Jones,* 166 F.3d at 49; *Local 802 v. Parker Meridien Hotel,* 145 F.3d 85, 89 (2d Cir.1998); *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129 (2d Cir.1993); *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990).

While amendment is to be freely granted, if an amendment would be futile, "it is not an abuse of discretion to deny leave to amend" to the moving party. *Ruffolo,* 987 F.2d at 131. Nor is the district court obligated to grant leave if the proposed amendment is patently without merit. *See Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990). It is within this framework that the court addresses the plaintiff's motion to amend its pleadings.

Bell seeks leave of the Court to amend its complaint at paragraphs 37, 38 and 40. Specifically, Bell's proposed amendment seeks to substitute "SSA and SSA MidAtlantic" for "SSA MidAtlantic." According to Bell, the basis of this change was the testimony of Charles Martin, an Ernst & Young consultant, who testified that he spoke to and received information about the software from Susan Krzywicki, an employee of SSA. In light of this testimony, Bell asserts that "it is clear that at least some of the misrepresentations alleged to have been made by SSA MidAt-

lantic, on behalf of SSA, were, in fact, made directly by SSA."

SSA first contends that the "proposed allegations of misrepresentation are not relevant in this contract case." As this decision has vacated the dismissal of the fraudulent inducement claims, SSA's argument is without merit. SSA also contends that "there is no basis in fact to support the amendment to the complaint." Specifically, SSA argues that "Ms. Krzywicki testified at her deposition that she did not relate any such information to Mr. Martin." This argument is without merit. Whether Krzywicki or Martin has testified truthfully is a question for the jury. Based on Krzywicki's testimony, however, the Court cannot say that the amendment would be futile.

Finally, SSA argues that it "would be unduly prejudiced by the proposed amendment to the complaint given the undue delay in amending the complaint." The Court finds this argument unpersuasive as the motion to amend was made shortly after the deposition of Martin and, also because discovery will most likely have to be re-opened, given the Court's decision to vacate the dismissal of the first, second, third and fourth causes of action. Accordingly, the Court grants Bell's motion for leave to amend the complaint as requested.

### III. CONCLUSION

Having reviewed the parties' submissions it is hereby

**ORDERED,** that Bell's motion for reconsideration of the Court's April 23, 1999 decision is **GRANTED;** and it is further

**ORDERED,** that upon reconsideration the Court vacates its prior dismissal of the first, second, third and fourth causes of action against System Software Associates, reinstates those causes of action and permits Bell to pursue its claims of fraud in the inducement and common law fraud in addition to its claims for breach of contract and breach of warranty; and it is further

**ORDERED,** that upon reconsideration the Court vacates its prior dismissal of the first, second and fourth causes of action against SSA MidAtlantic and reinstates those causes of action; and it is further

**ORDERED,** that Bell's motion for leave to amend the complaint is **GRANTED** and Bell shall serve and file the amended complaint within ten (10) days from the date of this order; and it is further

**ORDERED,** that upon receipt of this motion, the parties are to immediately arrange a conference before United States Magistrate Judge E. Thomas Boyle to discuss re-opening discovery; and it is further

**ORDERED,** that SSA's request for a pre-motion conference, seeking leave of the Court to file a motion for summary judgment is **DENIED,** with leave to renew at the completion of discovery; and it is further

**ORDERED,** that the caption of this action is to be amended to read as follows:

**SO ORDERED.**