*924 OPINION OF THE COURT
F. Dana Winslow, J.
Defendant’s motion to dismiss the complaint pursuant to CPLR 3211 is determined as follows.
This is an action for fraud, negligence and breach of warranty in connection with the installation and operation of an alarm system by Slomin’s Inc. in the home of plaintiffs Vincenzo and Concetta Cirillo. The Slomin’s system purchased by plaintiffs provided for central station monitoring, which contemplated the transmission of a signal from the alarm system via the telephone lines in the event of a break-in. On or about June 27, 1998, plaintiff Vincenzo Cirillo entered into four written contracts with Slomin’s: the retail installment agreement, central station five-year monitoring agreement, security system service plan, and addendum for Slomin’s wireless key FOB system (collectively, the contracts). Plaintiffs allege that, in purchasing the alarm system and entering into the contracts, they relied on the following representations made by Slomin’s sales agent Howard S. Goldberg and/or contained in the written promotional materials provided to plaintiffs prior to the execution of the contracts:
• That plaintiffs were purchasing a “top of the line” alarm system, guaranteed to keep their home safe from intruders.
• That the said alarm system was “hooked” into a central monitoring station operated and maintained by defendant and that, in the event of intrusion, the alarm system would “go off’ automatically.
• That response time, in the event of an emergency, would be less than five minutes.
• That the system was fail-safe in that, if the phone wires in the junction box were cut, the alarm would automatically “trip,” alerting the central monitoring station and the police would respond within minutes.
• That, to Goldberg’s “knowledge,” in the three years immediately preceding the installation of the said alarm system at plaintiffs’ home, there had not been any successful burglaries of homes that had a similar system installed by defendant.
*925 • That the defendant, its employees, agents and servants, were experts in the installation, maintenance and operation of central station alarm systems, and that they were the “best” on Long Island, if not in the State of New York, in the installation, maintenance and operation of such stations.
On January 6, 2002, the plaintiffs’ home was burglarized, at which time the home telephone lines were cut. Plaintiffs maintain that either the alarm system failed to transmit a signal or defendant’s central monitoring agents failed to appreciate it. In either event, plaintiffs assert, the police were not notified until plaintiffs returned home and called them from a neighbor’s telephone. Plaintiffs allege that they sustained substantial loss as a result of the burglary and the failure of Slomin’s to timely notify the police.
Plaintiffs commenced this action in April 2002, asserting claims of fraud, negligence and breach of warranty. Defendant now moves to dismiss pursuant to CPLR 3211 (a) (1) and (7) on the ground that all causes of action are barred by the express terms of the contracts. In particular, defendant refers to the merger clauses, disclaimers of representations and warranties, exculpatory clauses and limitation of liability or liquidated damages clauses contained in the contracts.
In ruling upon a motion to dismiss, the court must accept the facts alleged as true and accord plaintiffs the benefit of every possible favorable inference. (Leon v Martinez, 84 NY2d 83 [1994].) The complaint is to be construed liberally. The court may not address the merits of the complaint or any of its factual allegations, but must determine only whether the alleged facts fit within any cognizable legal theory. (Id.; P.T. Bank Cent. Asia v ABN Amro Bank N.V., 301 AD2d 373 [2003].) “[Dismissal is warranted only if the documentary evidence conclusively establishes a defense to the asserted claims as a matter of law * * * [T]he criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one.” (Leon v Martinez, supra at 88 [internal quotation marks omitted]; see also Steiner v Lazzaro & Gregory, 271 AD2d 596 [2000].)
Courts generally refrain from disturbing arm’s length transactions, and where the language of a contract is unambiguous, it is generally enforced according to its terms. (Symbol Tech. v Datamax Corp., 274 AD2d 386 [2000].) The contracts at issue here articulate an unambiguous intent to negate or limit *926 Slomin’s liability in almost every circumstance, and, on their face, present a defense to plaintiffs’ claims. However, New York courts have long recognized certain circumstances, including but not limited to fraud, in which even the most flawlessly drafted contract provisions may be subject to judicial scrutiny, and even avoided, in the interest of justice or sound public policy. The question is whether such circumstances exist here.
I. Fraud/Misrepresentation
The court shall first consider whether plaintiffs have a claim for fraud, and the legal effect upon such claim of the contractual provisions purporting to bar liability. To establish a prima facie case of fraud, the plaintiff must show that (1) the defendant made a material representation of fact that was false; (2) the defendant knew that the representation was false and made it with intent to deceive (scienter); (3) the plaintiff justifiably relied upon defendant’s misrepresentation; and (4) the plaintiff suffered some loss or harm as a result of such reliance. (P.T. Bank Cent. Asia v ABN Amro Bank N.V., supra at 250; Roth & Co. v Gourmet Pasta, 277 AD2d 293 [2000]; Giurdanella v Giurdanella, 226 AD2d 342 [1996].)
Defendant asserts that plaintiffs’ fraud claim is insufficiently pleaded. Specifically, defendant argues that plaintiffs have failed to allege scienter, i.e., that Goldberg, Slomin’s sales agent, knew that his statements were false and that he made them with intent to deceive. A fraud claim must be stated with sufficient particularity; that is, “the circumstances constituting the wrong shall be stated in detail.” (CPLR 3016 [b].) However, “neither CPLR 3016 (b) nor any other rule of law requires a plaintiff to allege details of the asserted fraud that it may not know or that may be peculiarly within the defendant’s knowledge at the pleading stage.” (P.T. Bank Cent. Asia v ABN Amro Bank N.V., supra at 377.) “CLR 3016 (b) ‘requires only that the misconduct complained of be set forth in sufficient detail to clearly inform a defendant with respect to the incidents complained of and is not to be interpreted so strictly as to prevent an otherwise valid cause of action in situations where it may be “impossible to state in detail the circumstances constituting a fraud.” ’ ” (Id., quoting Lanzi v Brooks, 43 NY2d 778, 780 [1977].)
Here, plaintiffs’ fraud claim is based upon the alleged representation by Goldberg that the system would transmit an alarm signal to the central monitoring station even if the telephone lines were cut. For purposes of this motion to dismiss, the court must assume that Goldberg did, in fact, *927 make such representation. Given that Slomin’s moving papers concede that the system was not designed to work in such circumstances, Goldberg’s alleged representation must have been false at the time it was made. Although plaintiffs do not claim that Goldberg knew it was false, plaintiffs need not speculate as to the extent of Goldberg’s knowledge, as such facts are peculiarly within defendant’s knowledge at this stage of the proceedings. Further, knowledge of falsity is not indispensable, if fraud also includes reckless misstatement and “the pretense of knowledge when knowledge there is none.” (Ultramares Corp. v Touche, 255 NY 170, 179 [1931] [Cardozo, Ch. J.].) As plaintiffs are entitled to the benefit of every favorable inference for purposes of this motion, it can be inferred from the context of the alleged statement that Goldberg intended to induce plaintiffs to purchase the Slomin’s alarm system and monitoring service, and that Goldberg, at minimum, assumed a pretense of knowledge in trying to conclude the sale. The court concludes that the facts alleged in the complaint are sufficient to put defendant on notice of the misconduct complained of, and thus are sufficient to withstand dismissal on the basis of CPLR 3016 (b).
Defendant also argues that plaintiffs are barred from asserting a fraud claim because the only fraud alleged relates to a breach of contract. (See Page v Muze, Inc., 270 AD2d 401 [2000].) The Court of Appeals has held that
“[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.” (Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 389 [1987] [citations omitted].)
To maintain a fraud action in a contractual setting, the plaintiff must allege “(1) a legal duty separate and apart from the contractual duty to perform; (2) a fraudulent representation collateral or extraneous to the contract; or (3) special damages proximately caused by the fraudulent representation that are not recoverable under the contract measure of damages.” (Bell Sports v System Software Assoc., 45 F Supp 2d 220, 227 [1999] [internal quotation marks omitted].)*
*928 The court determines that the alleged representations by Goldberg are neither collateral nor extraneous to the contract, insofar as they relate to and elaborate upon the nature of the system and service to be provided. However, it is the very essential nature of these representations, particularly the representation that the system would operate even if the telephone lines were cut, that persuades the court that Slomin’s had a legal duty to plaintiffs, separate and apart from the contractual duty to provide the system and service it promised. The court finds that Slomin’s had a legal duty to speak truthfully and accurately about the system it offered, and to disclose any material limitations in the system that would not be apparent to the purchaser. That is, Slomin’s had an affirmative duty to tell plaintiffs that the system would not operate if the telephone lines were cut.
In the context of fraudulent concealment case law, New York courts have acknowledged that a duty to disclose material information may arise absent a fiduciary relationship. “Under the ‘special facts’ doctrine, a duty to disclose arises ‘where one party’s superior knowledge of essential facts renders a transaction without disclosure inherently unfair.’ ” (Swersky v Dreyer & Traub, 219 AD2d 321, 327 [1996] [citations omitted]; see also Cohen Agency v Perlman Agency, 114 AD2d 930 [1985]; Young v Keith, 112 AD2d 625 [1985].) A seller with superior knowledge has a duty to disclose facts, not available to the purchaser, that would affect the purchaser’s conduct in the transaction. (Striker v Graham Pest Control Co., 179 AD2d 984 [1992]; Young v Keith, supra.) The duty to disclose arises where nondisclosure would “le[a]d the person to whom it was or should have been made to forego action that might otherwise have been taken for the protection of that person.” (Strasser v Prudential Sec., 218 AD2d 526, 527 [1995], quoting Caracci v State of New York, 203 AD2d 842, 844 [1994].)
Upon the facts alleged in this case, the court can infer that Slomin’s had superior knowledge regarding the capabilities of its own alarm system, which knowledge was unavailable to plaintiffs through ordinary inspection, and which was material to the plaintiffs’ decision to enter into the contracts with Slomin’s or to forego alternatives that might have provided more effective or complete protection. This superior knowledge gives rise to a duty to disclose which, in turn, supports a cause of ac *929 tion for fraud in the event of its breach, either by nondisclosure or by misrepresentation. It remains incumbent upon plaintiffs to prove that this duty was breached. As shall be discussed hereafter, defendant maintains that the contracts adequately disclose the system’s limitations and negate any reliance upon Goldberg’s representations. However, for purposes of the instant discussion, the court determines that a fraud action is not precluded by virtue of its being interposed in a contractual setting, given that a distinct legal duty exists, apart from performance under the contract. (Cf. Sommer v Federal Signal Corp., 79 NY2d 540 [1992] [fire alarm company had duty of reasonable care independent of contractual obligations, arising from the nature of its services and its relationship with its customer, insofar as it performed a service “affected with significant public interest”].)
Defendant next argues that plaintiffs have effectively extinguished their fraud claim by continuing to subscribe to Slomin’s alarm plan as well as its heating and air-conditioning plans. However, ratification of a transaction after discovery of a fraud may extinguish a right to rescission, but it does not extinguish a claim for monetary compensation for injuries resulting from the fraud. (Clearview Concrete Prods. Corp. v S. Charles Gherardi, Inc., 88 AD2d 461 [1982].) Although in some circumstances ratification will undercut a plaintiff’s claim of reliance (see id.; Champion Titanium Horseshoe, Inc. v WymanGordon Inv. Castings, Inc., 925 F Supp 188 [1996]), in this case, the fact that plaintiffs continue to do business with Slomin’s does not necessarily negate the claim that plaintiffs relied upon certain representations in choosing to do business with them initially. Plaintiffs may show that upon learning the true nature of the system, they chose to continue with Slomin’s out of economic or practical expedience, and/or they found other means to supplement their protection. That is not to say that they would have chosen Slomin’s in the first instance, had they known that the system could be easily deactivated. The court determines that, in this case, reliance is not defeated by ratification, as a matter of law, but that plaintiffs have the burden to prove reliance in the context of such ratification.
The court turns to the contract provisions that purport to bar liability. Each contract contains a provision substantially as follows:
“full agreement; severability. This agreement constitutes the full understanding of the parties and there are no oral Agreements, understandings *930 or representations between the parties. This Agreement may not be amended or modified except in writing signed by both parties. Should any provision of this Agreement be deemed void, the remaining parts shall not be affected.”
Defendant argues that this merger clause, together with the parol evidence rule codified at General Obligations Law § 15-301, bar any claim based upon alleged oral representations. However, the parol evidence rule and such general merger clauses exclude extrinsic evidence to contradict or vary the terms of a written instrument in the context of a suit to enforce an oral representation. Both are “ineffectual to exclude evidence of fraudulent representations” in an action to rescind a contract or to recover loss sustained as a result of fraudulent inducement. (Sabo v Delman, 3 NY2d 155, 161 [1957].)
Defendant further argues that the contracts contain specific disclaimers that do not fall within the rule articulated in Sabo v Delman (supra), and that, consequently, defeat plaintiffs’ claim. The Sabo rule, that fraud in the inducement vitiates a contract, is subject to exception. If a “plaintiff has, in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded [, s]uch a specific disclaimer destroys the allegations in plaintiff’s complaint that the agreement was executed in reliance upon these contrary * * * representations.” (Danann Realty Corp. v Harris, 5 NY2d 317, 320-321 [1959]; see also Citibank, N.A. v Plapinger, 66 NY2d 90 [1985] [where the agreement declared that defendants’ guarantee was “absolute and unconditional” and irrespective of the validity of any other agreement, defendants could not rely on the defense that they were fraudulently induced to sign the guarantee by the oral promise of an additional line of credit].) The specific disclaimer clause will be given effect particularly where it limits the authority of the agent to make extrinsic representations, and thus puts the plaintiff on notice that the agent’s statements may not be relied upon. (See Danann Realty Corp. v Harris, supra at 321-322, citing Ernst Iron Works v Duralith Corp., 270 NY 165, 171 [1936].)
In the case at bar, all of the contracts provide: “The salesman has no authority to change any terms or make representations other than contained in this Agreement, and the buyer represents that none have been made to or relied upon by the Buyer.” Section 8 of the service plan provides, in relevant part: *931 “Customer acknowledges that * * * Slomin’s has made no representations * * * and that customer has not relied upon any representations * * Section 7 of the monitoring agreement states, in relevant part: “Subscriber acknowledges that * * * Slomin’s has made no representations or warranties and that subscriber has not relied upon any representations * *
However, these disclaimer clauses appear to be no more than a reiteration of the general disclaimer contained in the merger clause, with the possible exception of the denial of the salesman’s authority. The clauses disclaim reliance upon any oral representation, and do not identify any particular subject matter, let alone the very matter as to which plaintiffs claim they were defrauded. In Danann, the disclaimer clause enumerated specific matters (e.g., the physical condition, rents, leases, expenses, operation or any other matter related to the subject premises) as to which the purchaser disclaimed reliance and certified that he had made independent investigation. The alleged oral misrepresentations concerned one of these very matters (the operating expenses and profits).
More troubling is the language contained in section 7 of the service plan and substantially reiterated on the back of the installment agreement: “Slomin’s makes no representation or warranty that the alarm system or that services supplied by Slomin’s may not be circumvented, compromised or defeated or that the alarm system or services will in all cases provide the protection for which they were intended.” This disclaimer is specific as to its subject matter, and Goldberg’s representation to the effect that the system would not be compromised by cutting the telephone wires falls within its scope.
Nonetheless, the rule in Danann should not be rigidly or automatically applied with respect to any of the disclaimers cited above. Keeping in mind that “opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts” (Danann Realty Corp. v Harris, supra at 322, quoting Freeman v Hewit, 329 US 249, 252 [1946]), this court finds that the Danann holding is not controlling in the instant circumstances. Both Danann Realty Corp. v Harris and Citibank, N.A. v Plapinger addressed transactions between sophisticated business people, negotiated at arm’s length. The Court in Danann emphasized that the facts allegedly misrepresented were matters not peculiarly within the defendant’s knowledge, and that the other party had the means available to him of knowing, “by the exercise of ordinary intelligence, the truth or the real quality of the subject of the *932 representation.” (Id. at 322.) In such circumstances, the asserted reliance upon such representations could not be considered justifiable. The Court opined that the complaining party must be held to his own representation, namely, that there were no oral representations made to him about the particular subject matter. Underlying this rule, and the parol evidence rule in general, is the rationale that claims based upon oral representations are inherently unreliable.
The instant situation, however, contemplates a consumer sales transaction, in which the merchant provides to the consumer a boiler plate contract form on a nonnegotiable basis. In such context, the consumer must be afforded more protection, and the reality of his contractual statements must be examined more closely. (Cf. Gentile v Garden City Alarm Co., 147 AD2d 124, 130 [1989] [in a negligence action against a burglar alarm company, wherein defendant allegedly misled plaintiffs as to the protection being provided, the Second Department cited with approval the lower court’s strict scrutiny of the transaction on grounds that this was a “consumer transaction in which the plaintiffs were presented with a non-negotiable pre-printed form contract”].)
With respect to the issue of justifiable reliance, the Danann dissent admonishes:
“In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. To deny this possibility is to ignore the frequent instances in everyday experience where parties accept * * * and act upon agreements containing * * * exculpatory clauses in one form or another, but where they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible and disarming statements of salesmen, or the customary course of business. To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.” (Danann Realty Corp. v Harris, supra at 324 [Fuld, J., dissenting], quoting Bates v Southgate, 308 Mass 170, 192, 31 NE2d 551, 558 [1941].)
This argument is more compelling here, in the context of a consumer sales transaction, than in the context of the business *933 transaction that took place in Danann. A consumer’s reliance upon the representations of the seller’s sales agent may be justifiable, especially with respect to technical matters (such as the capabilities of an alarm system), presumably within the agent’s expertise, which are incapable of independent verification by the consumer. This is true, even in the presence of a boiler plate clause in the sales contract denying the agent’s authority to speak. Upon whom or what else is the consumer supposed to rely? The merchant presumably trains and presents its salespersons to consumers for purposes of providing them with information about the company’s product or service. Such merchant cannot be permitted to escape all responsibility for the information provided simply by including a disclaimer of authority in a form contract. It cannot cloak its agents with authority on the one hand, and then deny it on the other.
This case provokes the following questions: Is the consumer’s claim, innately, any less reliable than the purported disclaimer of reliance? The consumer must sign the contract if he wants to obtain the product or service, and ordinarily must adopt it wholesale, without opportunity to negotiate as to particular provisions. Can the consumer really be said to “represent” a state of facts (i.e., that no oral representations were made to him), by virtue of his acquiescent signature? What if such state of facts is rendered untrue by the acts of the merchant’s sales agent? In such circumstances, the consumer’s claim that he relied upon the sales agent’s oral representations is no more inherently unreliable than the compulsory boiler plate disclaimer. To reflexively disallow parol evidence on the basis of such disclaimer is to reward the ingenuity of draftsmen at the expense of sound public policy, and to invite sales agents, armed with impenetrable contracts, to lie to their customers. Here, the danger of fraudulent claims is outweighed by the danger of unrestrained fraud against the consumer.
In the limited context of such consumer sales transactions, a better rule is to examine the plaintiffs claims on a case-by-case basis to determine their reliability. If the allegations state with particularity the oral representations relied upon, together with contextual facts, in sufficient detail to permit the court to gauge their inherent credibility, then the plaintiff should be permitted to go forward with his proof, notwithstanding the existence of a specific disclaimer in the contract form. The plaintiffs here have satisfied that test. Note that, in its motion papers, Slomin’s never denies that Goldberg actually made the statements attributed to him. Thus, not only are plaintiffs’ al *934 legations credible, but they are also unrefuted. In these circumstances, to dismiss the action on the basis of the disclaimer clause would require the court to ignore reality in favor of a contractual myth. The court finds that the disclaimers of reliance contained in the contracts do not shield Slomin’s from liability and do not prevent plaintiff from proving fraud in the inducement.
Defendant asserts that the element of reliance is defeated, nonetheless, because the contracts adequately notify purchasers of the system’s limitations. As discussed above, the installment agreement and service plan suggest that the system may be “compromised” or “circumvented.” The monitoring agreement disclaims liability for losses arising from “interruption of service due to * * * telephone line failure” or the failure of any public or private carrier service which prevents the signals from reaching the central monitoring center. Defendant maintains that these provisions “clearly and unambiguously state that the alarm may be circumvented by cutting the telephone lines and that Slomin’s is not responsible for any losses resulting from a burglary executed by cutting telephone lines.” (Reply mem of law at 7.)
The court disagrees. The installment agreement does not clarify how the system may be compromised or circumvented. Certainly other means may be contemplated, such as gaining access through an unprotected entryway. The monitoring agreement’s reference to interruption of telephone service brings to mind a telephone wire felled by a storm, rather than cut by a burglar, or widespread service outages. At best, the clauses, contained in separate agreements, would have to be pieced together like a puzzle to reach the conclusion asserted by defendant. Furthermore, the provisions cited by defendant, even if clear in the abstract, are rendered ambiguous by Goldberg’s alleged explicit statement that the alarm signal would be triggered even if the telephone lines were cut. The court finds that these contractual provisions do not so clearly and sufficiently apprise plaintiffs of the system’s limitations that they negate plaintiffs’ justifiable reliance, as a matter of law, upon Goldberg’s contrary representations.
Finally, defendant asserts that exculpatory clauses contained in the contracts bar all of plaintiffs’ claims, including the fraud claim. According to defendant, the contracts expressly provide that Slomin’s is not liable for losses sustained in a burglary resulting from the cutting of telephone lines. Defendant cites the disclaimer provisions quoted above and several other *935 clauses which, essentially, provide that Slomin’s shall not be responsible for damage or loss resulting from telephone line failure, interruption of telephone service or causes beyond Slomin’s control.
Assuming, without deciding, that these clauses cover the situation in which the telephone line is cut by a burglar, they nonetheless do not exculpate the defendant from its own fraud. Whereas an exculpatory clause is enforceable against claims of ordinary negligence, such clauses are unenforceable with respect to claims of reckless or intentional conduct, as a matter of public policy. (Sommer v Federal Signal Corp., 79 NY2d 540, 554 [1992] [fire alarm company cannot restrict liability for conduct “evincing a reckless disregard for its customers’ rights”].) If the alleged misrepresentations are first proven, then ultimately shown to be merely negligent, as opposed to reckless or intentional, then the exculpatory clauses will apply to defeat this claim.
In short, the court finds no basis, at this stage of the proceedings, to dismiss the fraud cause of action. Plaintiffs are entitled to discovery and to attempt to prove their claim.
II. Negligence
Plaintiffs’ second cause of action asserts that Slomin’s was negligent in the manner in which it installed, operated, tested and maintained the alarm system. Although, generally, there is no cause of action for negligent performance of a contract (see, e.g., City of New York v 611 W. 152nd St., 273 AD2d 125 [2000]; Fluhr v Goldscheider, 264 AD2d 570 [1999]), New York courts have recognized that a distinct duty of care exists in connection with the provision and monitoring of alarm systems. (See, e.g., Sommer v Federal Signal Corp., supra', Gentile v Garden City Alarm Co., 147 AD2d 124 [1989].) Nonetheless, in addition to the exculpatory clauses discussed above, the contracts contain provisions that expressly disclaim liability resulting from Slomin’s negligent performance or failure to perform under the contracts. (See installment agreement § 8; monitoring agreement § 6 [D]; service plan § 7.) These exculpatory clauses are enforceable to the extent that they preclude claims based upon ordinary negligence. (Sommer v Federal Signal Corp., supra.) For the negligence cause of action to survive, plaintiffs would have to allege conduct that is grossly negligent or “evinces a reckless indifference to the rights of others.” (Id. at 554.)
Plaintiffs have failed to allege conduct which rises to the level of gross negligence with respect to the installation, opera *936 tion, testing and maintenance of its alarm system. (See Aphrodite Jewelry v D&W Cent. Sta. Alarm Co., 256 AD2d 288 [1998]; Feldman Furs v Jewelers Protection Servs., 134 AD2d 171 [1987].) Even if they had, such conduct could not be found to be the cause of plaintiffs’ loss. No matter how carefully the system was installed, operated or maintained, it would have failed to transmit an alarm upon the severance of the telephone wire.
In the same cause of action plaintiffs also allege a negligent failure to inform plaintiffs that the system would not transmit an alarm signal if the wires were cut, and a negligent failure to “take steps necessary” to cause an alarm signal to be given even if the wires were cut. This sounds like a defective products claim, as it alleges a breach of duty to cure or to disclose what it presumes to be a dangerous design defect, i.e., that the system could be rendered inoperative by a simple procedure.
Generally, there is no tort recovery for economic loss (i.e., other than physical damage to persons or property) resulting from the failure of a product to perform as intended. (Schiavone Constr. Co. v Mayo Corp., 56 NY2d 667 [1982], revg on dissenting op below 81 AD2d 221 [1981].) In a case arising out of the burglary of a jewelry store, the Fourth Department held that the theft of inventory and damage to store fixtures, if attributable to the failure of the burglary alarm system, were nonetheless purely economic losses, not recoverable under a negligence or strict products liability theory. (See Arell's Fine Jewelers v Honeywell, Inc., 170 AD2d 1013 [1991].)
More recently, however, the Third Department upheld a tort claim based upon a defective fire alarm. In La Barre v Mitchell (256 AD2d 850, 852 [1998]), the Court considered factors including the nature of the defect, the manner in which the damages arose and the resulting harm to determine whether the “safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law” was applicable to the particular claim. The Court determined that a defectively designed alarm may be considered an inherently dangerous product. It reasoned that the failure of a fire alarm system to perform its intended function could have catastrophic consequences and that “a design creating an unreasonable risk of failure in such a system would render it dangerous and defective.” (Id. at 852.)
Although the Arell’s claim arose out of a defective burglar alarm and the La Barre case concerned a defective fire alarm, this court nonetheless finds the holding and rationale in La Barre more closely applicable to the facts alleged here. In *937 Arell’s, the burglary occurred in a place of business. The Court noted that the losses resulted only from the failure of the burglary alarm to perform as intended and not from any accidental occurrence. A loss of inventory and fixture damage may be characterized as a business loss, not implicating any physical safety concerns. However, a burglary in the home poses a risk to personal safety, and the theft of personal property and/or damage to the home may constitute more than purely economic loss. As in La Barre, the “safety-insurance” policy of tort law is applicable. In such circumstances, the harm to the homeowner is not just that the system fails to perform as intended, but that the security of the home and the safety of its occupants are compromised.
Further, in Arell’s, the defendant was an alarm manufacturer with whom the plaintiff had no relationship. In the instant case, defendant sold and installed the alarm system, and provided ongoing monitoring and maintenance services to plaintiffs. This court finds that a duty to warn the homeowner of the vulnerability of the alarm system arises independently out of the general duty of due care that accompanies the ongoing contractual relationship between the homeowner and the alarm company. (See Sommer v Federal Signal Corp., supra; see also DCR, Inc. v Peak Alarm Co., 663 P2d 433 [Utah 1983] [Utah court held that alarm company had duty, arising out of general duty of due care, to warn store owner that the system could be rendered inoperative by a simple deactivating technique well known to criminals].)
This court finds that a burglar alarm system installed in a person’s home, which is easily deactivated by a simple, well-known technique, may be considered an inherently dangerous product, requiring, at minimum, a full and clear disclosure to the homeowner of the system’s limitations. A homeowner’s resulting losses cannot be deemed purely economic as a matter of law, although the nature and extent of such damages still must be proven. This finding is limited to the instant circumstances, where the defendant is the seller of such alarm system and maintains an ongoing relationship with the homeowner. The court does not decide whether a manufacturer owes a corresponding duty to the homeowner.
In addition to damages, plaintiffs also must prove that defendant breached its duty to disclose. However, to the extent such breach, if proved, constitutes ordinary negligence, such claim is barred by the exculpatory clauses contained in the contracts. In addition to the provisions cited above, the *938 contracts specifically disclaim liability for losses due to product failure or inadequacy, and for special or consequential damages resulting from a burglary. For plaintiffs’ claim to survive, defendant’s failure to disclose the alarm system’s limitations must rise to the level of gross negligence or intentional conduct. As discussed above, the allegations in the complaint, if proved, could support a finding of gross negligence or intentional misrepresentation in the context of a fraudulent inducement claim. There is no reason why the alleged conduct could not also be found to constitute gross negligence in the context of an alternate theory of liability, namely, the breach of an ongoing duty of due care. Accordingly, the negligence cause of action is sustained to the extent that it alleges a grossly negligent failure to warn of or cure the alarm system’s limitations.
III. Breach of Warranty
Plaintiffs’ third, fourth and fifth causes of action are for breach of warranty under article 2 of the Uniform Commercial Code. Specifically, plaintiffs allege a breach of the implied warranty of merchantability (UCC 2-314), the implied warranty of fitness for a particular purpose (UCC 2-315) and certain express warranties, allegedly contained in Goldberg’s representations and/or Slomin’s promotional materials (UCC 2-313), as set forth above. Defendants assert that (i) insofar as the contracts call for Slomin’s to provide services, the UCC does not apply because it only applies to the sale of goods, and (ii) the contracts expressly exclude all such warranties.
The court need not consider the extent to which article 2 applies in light of its determination that the contracts effectively bar all claims for breach of warranty. Each of the contracts contains a statement, in all capitals, under a bold heading, to the effect that Slomin’s makes no express or implied warranties as to any matter whatsoever, including any warranty of merchantability or fitness for a particular purpose. As these clauses specifically mention “merchantability” and are sufficiently conspicuous as a matter of law, the implied warranties of merchantability and fitness are effectively excluded. (See UCC 2-316 [2]; Sky Acres Aviation Servs. v Styles Aviation, 210 AD2d 393 [1994]; Carbo Indus. v Becker Chevrolet, 112 AD2d 336 [1985]; Pennsylvania Gas Co. v Secord Bros., 73 Misc 2d 1031 [1973].)
With respect to the claim for breach of express warranty, plaintiffs have failed to identify any written statement contained in the promotional materials that can be said to constitute a warranty. Plaintiffs base their fifth cause of action,
*939 essentially, upon Goldberg’s alleged oral representation that the system would transmit an alarm signal even if the telephone wires were cut. This oral statement contradicts the merger clause and the provisions of the contracts which specifically disclaim express warranties. Accordingly, proof of this statement is barred by the parol evidence rule codified at UCC 2-202. (See Sky Acres Aviation Servs. v Styles Aviation, supra; Sunkyong Am. v Beta Sound of Music Corp., 199 AD2d 100 [1993].) The rule in Sabo v Delman (supra), that allows introduction of parol evidence to prove fraud in the inducement, does not apply in the context of a breach of warranty claim. The Sabo court expressly acknowledged that use of parol evidence to contradict a writing is prohibited where a person seeks to enforce an oral representation or promise relating to the subject matter of the contract. (Cf. Keene Corp. v Bogan, 1990 WL 1864, 1990 US Dist LEXIS 220 [SD NY, Jan. 11, 1990].)
IV. Monetary Damages
Finally, Slomin’s argues that, even if Slomin’s may be found liable on any theory of liability set forth in the complaint, plaintiffs’ claim for money damages is barred by the contracts. The addendum limits Slomin’s obligations pertaining to the alarm equipment to the repair and replacement of such equipment, and expressly disclaims liability for special and consequential losses arising out of a burglary. Each of the other contracts clearly and unambiguously limits Slomin’s liability, providing that Slomin’s shall not, under any circumstances, be required to pay more than $250. However, as a result of this order, the only surviving causes of action are for fraud and gross negligence. The Court of Appeals has determined that clauses limiting the amount of damages are treated the same as exculpatory clauses in general, that is, both are enforceable against ordinary negligence claims, but are unenforceable against claims of gross negligence or intentional misconduct. (Sommer v Federal Signal Corp., supra.) Thus, Slomin’s liability for monetary damages is neither barred nor limited by the clauses cited above.
In accordance with the foregoing discussion, it is ordered that defendant’s motion to dismiss pursuant to CPLR 3211 is granted in part to the extent that plaintiffs’ breach of warranty (third, fourth and fifth) causes of action are dismissed. The motion is denied in part to the extent that plaintiffs’ fraud (first) cause of action and negligence (second) cause of action are sustained, to the extent set forth above.

 In its memorandum of law, Slomin’s incorrectly cites Bell Sports (supra) as holding that all three criteria must be satisfied in order to maintain a *928 fraud action. The court has reviewed the case and notes that the requirements are stated in the disjunctive, meaning that satisfaction of any one of them is sufficient to sustain the action.